IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, | |
| Plaintiff, | **8:24CV51** |
| vs. | |
| U.S. RAILROAD RETIREMENT BOARD, | **MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | |

In this action, plaintiff Union Pacific Railroad Company (UP) seeks judicial review under the Administrative Procedure Act (APA) of an order by defendant U.S. Railroad Retirement Board (RRB) granting "party" status to the Brotherhood of Maintenance of Way Employees Division – International Brotherhood of Teamsters (BMWED) for purposes of an upcoming administrative hearing (the Board Hearing). Filing 22 at 1. UP alleges that the Board Hearing is to determine whether certain individuals who perform work known as "flagging" but who are not employed by UP should be deemed covered by the Railroad Retirement Act (RRA) and the Railroad Unemployment Insurance Act (RUIA) for purposes of receiving retirement benefits under those statutory programs. Filing 22 at 1 (¶ 2). This case is now before the Court on RRB's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Filing 30. RRB asserts that the Court lacks jurisdiction over UP's claim because final orders of RRB must be appealed to a Circuit Court of Appeals. Filing 31 at 1. For the reasons stated below, RRB's Motion to Dismiss is granted.

## I.   INTRODUCTION

### A.  Factual Background

RRB asserts that its challenge to subject-matter jurisdiction is "facial." Filing 31 at 6. Consequently, the Court looks "only to the face of the pleadings" and affords the non-moving

party the benefit of Rule 12(b)(6) "safeguards." *Croyle by & through Croyle v. United States*, *908 F.3d 377, 380–81 (8th Cir. 2018)*. However, consideration of the "face of the pleadings" opens the door to consideration of "the materials that are necessarily embraced by the pleadings and exhibits attached to the complaint." *Carlsen v. GameStop, Inc.*, *833 F.3d 903, 908 (8th Cir. 2016)* (cleaned up) (explaining what may be consider on a Rule 12(b)(1) facial attack). Therefore, the factual background to this case is drawn from UP's Amended Complaint, Filing 22, which is now UP's operative pleading, materials necessarily embraced by the Amended Complaint, and exhibits attached to it.

Plaintiff UP is a freight railroad carrier headquartered in Omaha, Nebraska. Filing 22 at 2 (¶ 6). Defendant RRB, which is headquartered in Chicago, Illinois, was created by Congress *inter alia* to administer retirement, disability, survivor, and unemployment-sickness benefit programs for railroad employees and their families. Filing 22 at 2 (¶ 7). RRB's regulations and procedures applicable to its authority to investigate and determine "employer" and "employee" coverage under the RRA and the RUIA are set out in 20 C.F.R. Part 258 and 20 C.F.R. Part 259. Filing 22 at 4 (¶ 15). A Part 259 proceeding is an "initial investigation" by RRB's Office of General Counsel (OGC) resulting in submission to the Board of "a recommendation concerning the coverage determination" followed by an initial determination by the Board. 20 C.F.R. § 259.1. A Part 258 proceeding is an investigation by the Board, one of its members, or a designated examiner who will "conduct hearings, require and compel the attendance of witnesses and the production of records and documents, administer oaths, take testimony, make all pertinent investigations and findings of fact, and render decisions upon such findings." 20 C.F.R. § 258.1.

Nonparty RailPros Field Services (RailPros) employs or contracts with certain individuals who perform work known as "flagging" for the benefit of third parties that require access to UP's right of way but whose projects do not concern UP's own work or operations. Filing 22 at 1–2 (¶ 2). UP offers as an example of such third parties a utility that needs access to repair a power line. Filing 1 at 2 (¶ 2). "Flagging" is a rail industry term for the job of providing protection for workers who may be working on or close to railroad tracks from the hazards of being struck by a train or other on-track equipment. Filing 22 at 5 (¶ 21). Nonparty BMWED is a labor organization representing some of UP's employees. Filing 22 at 3 (¶ 11) (indicating that BMWED has "labor dealings with UP"). However, BMWED does not represent the RailPros workers. Filing 22 at 2 (¶ 3).

On or about November 8, 2017, BMWED filed a request with RRB's OGC for determination of the coverage status of the RailPros workers performing "flagging" services on property owned by UP and other major railroads. Filing 22 at 5 (¶ 20). The OGC opened an investigation in response to BMWED's request. Filing 22 at 5 (¶ 22). UP only learned of the investigation four years later when it received a letter from OGC staff dated December 9, 2021, asking UP to respond to 11 questions regarding flagging services performed by RailPros workers. Filing 1 at 6 (¶ 23). The letter from OGC staff informed UP that the investigation was being conducted under Part 259 of RRB's regulations, but the letter did not mention any union. Filing 22 at 6 (¶ 23). In December 2023, in response to a Freedom of Information Act (FOIA) request, UP received a copy of the letter dated November 6, 2017, from BMWED to the OGC that UP alleges triggered RRB's investigation. Filing 1 at 6 (¶ 28). Additional information UP obtained pursuant to the FOIA request indicates that BMWED wrote to RRB "at least a half-dozen more times since that initial letter." Filing 22 at 6 (¶ 28). UP characterizes these letters as

"pressuring [RRB] to take action and provide BMWED with updates on [RRB's] progress to investigate UP." Filing 22 at 6–7 (¶ 28). UP cooperated with RRB's investigation by providing a detailed response to initial questions on April 29, 2022, by subsequently participating in several telephone conversations with OGC staff, and by producing a witness for an informal telephonic interview involving responses to 16 questions prepared by OGC staff about flagging activity on UP property and related matters. Filing 22 at 6 (¶ 27).

On April 14, 2023, RRB entered an Order (April Order), a copy of which is attached to the Amended Complaint as Filing 22-1 at 3–4, for proceedings pursuant to Part 258 (instead of Part 259). First, the April Order directed as follows:

(1) Pursuant to section 258.1 of the regulations of the Railroad Retirement Board (20 C.F.R. §258.1), Marguerite P. Dadabo is appointed to serve as a Designated Examiner for the Board on the earliest date(s) which can be arranged to conduct a hearing (which may be held at one time or on separate days) for the purpose of obtaining oral, written, and other testimony with respect to the following issue:

Are individuals who perform railroad flagging services through RailPros Field Services, lnc.'s contract with Union Pacific Railroad "in the service of an employer" under the Railroad Retirement Act of 1974 and Railroad Unemployment Insurance Act as defined in sections 1(d)(1) and 1(e) of those Acts?

Filing 22-1 at 3; *see also* Filing 22 at 1 (preface), 6 (¶¶ 24–25). A determination that RailPros workers are covered (*i.e.*, "in the service of an employer") would require RailPros and/or UP to file employee activity and compensation reports of "creditable service" and make employment tax contributions for such individuals as required by the RRA and the RUIA. Filing 22 at 6 (¶ 26).

The April Order also stated the following:

(2) Notice of the hearing shall be given to Union Pacific Railroad, RailPros Field Services, Inc., the Brotherhood of Maintenance of Way Employes [sic] Division - International Brotherhood of Teamsters, and as needed to individuals who performed service through RailPros Field Services, Inc.'s

4

contract with Union Pacific Railroad during the period 2016 through the date of this Board Order, and as needed to other individuals with pertinent information. Each of the recipients of such notice shall be offered an opportunity to present evidence and to make arguments before the Designated Examiner.

Filing 22-1 at 3 (¶ 2); Filing 22 at 8 (¶ 35) (paraphrasing in part and quoting in part this paragraph of the April Order). UP alleges that the Board's April Order "[i]ncorrectly" identified BMWED as an entity entitled to participate in the Board Hearing even though BMWED does not represent the RailPros workers. Filing 22 at 8 (¶ 36).

UP contends that the business arrangements it has with RailPros and other entities that need access to UP's right of way to perform work of their own are confidential and have been kept private. Filing 22 at 7 (¶¶ 29–31). UP acknowledges that terms and details of these arrangements will be material to RRB's deliberations and will be heard and considered by RRB. Filing 22 at 7 (¶ 32). However, UP alleges that BMWED has taken an adversarial position concerning contracted flagging services with UP and other railroads. Filing 22 at 7 (¶ 33). Indeed, UP accuses BMWED of a "deliberate attempt over this years-long period [from 2017 to 2023] to foment a regulatory dispute" over flagging services. Filing 1 at 8 (¶ 33).

As to the effect of BMWED's participation in the Part 258 proceedings, UP alleges,

> By having party status to the Board hearing (or any related proceedings), BMWED will have a right of access to information submitted into the record—whether via documentary evidence or testimony—including UP's confidential business information. This would be highly damaging and prejudicial to UP.

Filing 1 at 8 (¶ 34). More specifically, UP alleges that allowing BMWED to participate will have the following effects:

> By effectively giving BMWED "party" status to the hearing, the Board (through the April Order) guaranteed that BMWED will gain access to UP's confidential business information that by necessity will be (or has already been) submitted into the administrative record for the hearing and related proceedings. Indeed, UP has already submitted confidential business information to the Board that is part of the administrative record and the Hearings Examiner assigned to

conduct the hearing, Marguerite Dadabo, has informed UP that the administrative record will be circulated to all parties in advance of the hearing.

Filing 22 at 8–9 (¶ 37). UP contends that BMWED's participation as a party is not authorized by any governing statutes or regulations. Filing 22 at 9 (¶ 38).

UP alleges that the Examiner set out in a letter dated August 3, 2023, the reasons that BMWED was added as a "party" to the Part 258 Hearing. Filing 22 at 9–10 (¶¶ 41–42). Because that letter is specifically embraced by the Amended Complaint, and it is elsewhere in the record, the pertinent part of the letter is quoted here:

> The Board is expressly empowered by section 5(c)(4) of the RUIA to designate one of its officers or employees to receive evidence and report to the Board whether any person or company should be required to pay contributions under the RUIA, regardless of whether any claim for benefits has been filed or is currently pending, and requires the Board or the person designated to notify all parties properly interested of their right to participate in the proceedings and, if a hearing is held, of the time and place of the hearing. 45 U.S.C. § 355(c)(4). The Board designated BMWED as a party to the Part 258 proceeding in order to gather relevant evidence as permitted by statute.

Filing 4-4 at 3; *see also* Filing 22 at 9–10 (¶¶ 41–42). The Examiner's letter states further,

> The Board's inclusion of BMWED as a party to this Part 258 proceeding, which is intended to obtain additional information about those flagging services, is an appropriate exercise of the Board's broad authority under the RRA and RUIA and is within the Board's discretion under Part 258. This was not a designation of BMWED as a party for purposes of Part 259.

Filing 4-4 at 3–4; *see also* Filing 22 at 10 (¶ 42).

In an effort to find a mutually acceptable solution, and at the Examiner's request, UP submitted a draft protective order that would bar BMWED's access to any confidential business information. Filing 22 at 10 (¶ 43). On September 12, 2023, the Examiner provided the parties with a protective order and a proposed non-disclosure agreement (NDA), but the protective order did not adopt material protections proposed by UP. Filing 22 at 10–11 (¶ 45). The Examiner told UP that BMWED had signed the NDA, Filing 22 at 11 (¶ 46), but despite further discussions, UP

6

declined to accept either the protective order or the NDA. Filing 22 at 11 (¶ 50). Attempts to resolve the dispute continued from October 2023 into January 2024 during which the deadlines for the Part 258 proceeding were held in abeyance. Filing 22 at 12 (¶¶ 51–54). On January 30, 2024, UP's counsel informed the Examiner in a follow-up telephone call that UP could not accept any outcome that would entitle BMWED or its counsel to be a party to the Board proceedings, and that if the Board did not withdraw the part of its April Order that gave BMWED party status, UP would seek judicial review. Filing 22 at 12 (¶ 42).

UP alleges that it exhausted its efforts to obtain relief from the April Order from the Board before filing its original Complaint. Filing 22 at 12 (¶ 55).

### B.  Procedural Background

On February 9, 2024, UP filed its original Complaint, Filing 1, and a Motion for Preliminary Injunction, Filing 2. On March 28, 2024, UP filed its Amended Complaint, Filing 22, which is now its operative pleading, as well as an Unopposed Motion to Hold its Motion for Preliminary Injunction in Abeyance, Filing 24. By Text Order filed March 29, 2024, a magistrate judge held the Motion for Preliminary Injunction in abeyance until thirty days after RRB serves notice to the Court and UP that a new Hearing Examiner has been appointed. Filing 26.

UP's sole claim in the Amended Complaint is pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A), alleging that the Board's April Order is unlawful, arbitrary, capricious, and an abuse of discretion. Filing 22 at 12. UP seeks the following relief: (1) a declaration "that the Board's decision in its April Order to grant BMWED party status with respect to the Part 258 hearing was unlawful or, alternatively, arbitrary, capricious, and an abuse of discretion"; (2) an order "[s]et[ing] aside the decision challenged herein and prevent[ing] the Board (including any of its employees or agents) from holding a hearing or taking any other action in connection with the Board's proceedings in this matter in which BMWED would be

entitled to participate as a party or otherwise gain access to UP confidential business information"; and (3) an order "[a]ward[ing] UP such other relief as this Court deems appropriate." Filing 22 at 14.

On May 17, 2024, RRB filed the Motion to Dismiss now before the Court. Filing 30. RRB argues that UP attempts to challenge the Board's authority to designate BMWED as a party under the APA, but this Court lacks jurisdiction over UP's claims because final orders of the Board must be appealed to the Circuit Court of Appeals. Filing 31 at 1. UP filed its Brief in Opposition, Filing 32, on June 7, 2025, and RRB filed its Reply, Filing 35, on June 20, 2024.

The Motion to Dismiss is now fully submitted.

## II.  THE PARTIES' ARGUMENTS

RRB's opening argument is relatively straightforward: It is that although UP asserts federal question jurisdiction pursuant to 28 U.S.C. § 1331 over its action under the APA for judicial review by this Court of the Board's decision to designate BMWED as a party to the Part 258 proceeding, the RRA and the RUIA vest the courts of appeals, not the district courts, with jurisdiction over appeals from Board decisions. Filing 31 at 5. Somewhat more specifically, RRB argues that pursuant to 45 U.S.C. § 231g, decisions of the Board that determine the rights and liabilities of any person under the RRA are subject to judicial review in the same manner as decisions under the RUIA. Filing 31 at 6. RRB argues that the RUIA in turn provides for review of any final decision of the Board only in certain federal courts of appeals. Filing 31 at 6. RRB argues, "[W]hen Congress provides for exclusive review in the courts of appeals, only such courts have jurisdiction." Filing 31 at 6 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994)). RRB asserts that Congress did not vest the district courts with jurisdiction over appeals of Board decisions. Filing 31 at 6. RRB states that, for purposes of this Motion only, it "concedes Board Order 2023-33 [the April Order] is a final order within the meaning of the

RUIA's judicial review provision." Filing 31 at 6. RRB then argues that because UP is challenging a final order of the Board, its appeal must be filed in one of the courts of appeals identified in 45 U.S.C. § 355(f). Filing 31 at 6.

UP's response is somewhat more complex. In UP's view, RRB's argument that this Court lacks jurisdiction to review the April Order "is wrong." Filing 31 at 2. Instead, UP argues that its action is pursuant to the APA, specifically, 5 U.S.C. § 702, and that this Court properly has subject-matter jurisdiction under 28 U.S.C. § 1331, the federal question jurisdiction statute. Filing 32 at 2.

UP argues that there are three reasons that 45 U.S.C. § 231g does not apply to this lawsuit. Filing 31 at 2. First, UP argues that it seeks review of an admittedly final order of the Board, but a procedural one rather than a decision on the merits. Filing 32 at 2. UP points out that § 231g refers to "[d]ecisions of the Board determining the rights or liabilities of any person under this subchapter," but the April Order was not such a "decision" involving the determination of substantive rights and liabilities as Congress provided. Filing 32 at 7–8. Second, UP argues that the April Order did not "determin[e] the rights or liabilities of any person" under the RRA. Filing 32 at 2. UP argues that the review provisions of both the RRA and the RUIA focus on decisions involving the rights of claimants to benefits and those who must provide them. Filing 32 at 8-9. UP argues that BMWED's "party" status is collateral to the substance of what the Board was created to decide, so it would be "odd and unreasonable" to think that Congress would provide for review of such a collateral procedural order only by the federal courts of appeals. Filing 32 at 9. Third, UP contends that the relevant subject of the April Order was BMWED, but BMWED is not a person whose "rights or liabilities" could have been determined by the Board in the pending proceedings. Filing 32 at 2–3. UP points out that

BMWED's rights and liabilities simply are not at issue in the Board proceedings because the issue in those proceedings is the potential statutory liabilities of UP and RailPros and the potential statutory rights and responsibilities of RailPros workers. Filing 32 at 9.

UP argues further that collateral agency actions are properly challenged in federal district court. Filing 32 at 10. UP points out that RRB does not dispute that the April Order was a final agency action. Filing 32 at 10 (citing Filing 31 at 6). UP then argues that the test of finality for judicial review pursuant to the APA does not turn on whether it is the last administrative order contemplated by the statutory scheme but on whether it imposes an obligation or denies a right with consequences sufficient to warrant review. Filing 32 at 10–11. Thus, UP argues that this Court has jurisdiction of a purely procedural order that is collateral to the ultimate merits of any final Board decision on coverage issues. Filing 32 at 11. UP argues that "[p]arsing and segregating collateral issues from merits-based issues in scenarios where Congress has carved out particular merits-based issues for judicial review by the courts of appeals is hardly unique to Board proceedings." Filing 32 at 12.  RRB cited *Thunder Basin* for the proposition that when Congress grants judicial review authority to the courts of appeals, only those courts have jurisdiction. Filing 31 at 6. However, UP argues that *Thunder Basin* is not on point because it addressed whether a dispute committed to agency adjudication in the first instance by statute could be challenged preemptively by the regulated party in federal district court. Filing 32 at 13. In other words, UP asserts, RRB's position is that because Congress granted the courts of appeals review jurisdiction over some Board determinations, it must follow that any action by the Board must be reviewed by the courts of appeals. Filing 32 at 15. UP argues, "That position blinks reality and basic principles of federal question jurisdiction and administrative law, turns a

blind eye to statutory construction and what the Acts actually say, and flies in the face of common sense." Filing 32 at 15.

In reply, RRB argues that whether the April Order is a final decision on the merits or a procedural order, judicial review rests with the courts of appeals, so that UP's Amended Complaint should be dismissed. Filing 35 at 1. Interestingly, almost the first argument RRB offers in reply is an unexplained jettisoning of a position it took in its opening brief: RRB argues in reply that the April Order is not a final order. Filing 35 at 2 (stating as a section heading, "BOARD ORDER 2023-33 IS NOT A FINAL ORDER"); *but see* Filing 31 at 6 ("Because this is a facial challenge to jurisdiction, and for purposes of this motion only, RRB concedes [the April Order] is a final order within the meaning of the RUIA's judicial review provision. Since UP is challenging a final order of the Board, its appeal must be filed in one of three courts [of appeals]." (internal citation omitted)). This change of position is essential to RRB's new argument that judicial review under the APA is only available once the agency renders a final decision. Filing 35 at 2. RRB argues, "In light of this finality requirement, interlocutory challenges like the one UP alleges it brings here run afoul of the purpose of the final agency action rule." Filing 35 at 2. RRB contends that so long as UP still has an opportunity to convince the Board on the ultimate issue of the employment status of RailPros flaggers, it makes no sense for any federal court to intervene. Filing 35 at 3. RRB also points to precedent holding that directing a party to participate in an administrative proceeding is not final agency action. Filing 35 at 3. RRB argues that UP admits that it is not challenging final agency action because it admitted that the Board has not yet decided the merits of whether RailPros workers are covered

by the RRA and the RUIA. Filing 35 at 4 (citing Filing 32 at 6–7).[1] UP then argues that the factors identified in *Thunder Basis Coal Co. v. Reich*, 510 U.S. 200 (1994), do not favor finding that this Court has jurisdiction over this dispute. Filing 35 at 5–8. RRB argues that meaningful judicial review is not foreclosed because unlike the constitutional challenge to the structure and operation of the agency at issue in *Thunder Basin*, UP challenges a discrete decision that RRB made to include BMWED as a party in the proceeding, which BMWED can still challenge before the agency. Filing 35 at 6–7. RRB argues that "collateralism" favors RRB because RRB's determination of party status is inextricably enmeshed with RRB's operation of its own proceedings and execution of its responsibilities. Filing 35 at 7. Finally, RRB argues that UP's challenge falls squarely within RRB's expertise because 45 U.S.C. § 355(c)(4) grants the RRB the authority to notify all properly interested parties of their right to participate in agency proceedings and § 355(c)(5) requires notice to interested parties. Filing 35 at 7.

### III. LEGAL ANALYSIS

#### A. Challenges to Subject Matter Jurisdiction

As mentioned at the outset of this ruling, RRB's Motion to Dismiss is pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. "[A] federal court always has jurisdiction to determine its own jurisdiction." *Thigulla v. Jaddou*, 94 F.4th 770, 773 (8th Cir. 2024) (quoting *United States v. Harcevic*, 999 F.3d 1172, 1178 (8th Cir. 2021), in turn quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)). The Eighth Circuit Court of Appeals has explained that on a Rule 12(b)(1) motion challenging subject-matter jurisdiction,

---

[1] UP requested leave to file a surreply to address this change in RRB's position, but the Court denied that request in a Text Order. Filing 37; *see also* NECivR 7.1(c)(3) ("No party may file further briefs or evidence without the court's leave."); *Cornice & Rose Int'l, LLC v. Four Keys, LLC*, 76 F.4th 1116, 1123 (8th Cir. 2023) (explaining that "sur-replies are viewed with disfavor"). The Court recognized RRB's unexplained change in position without the need for UP's surreply. Also, the Court concluded that RRB's change in position was not dispositive of the Motion to Dismiss.

The plaintiff bears "the burden of proving the existence of subject matter jurisdiction," and we may look at materials "outside the pleadings" in conducting our review. [*Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc)] (quoting *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005)). Because of the "unique nature of the jurisdictional question," *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) (citation omitted), it is the court's duty to "decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue," *id.* at 730. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards. *Id.* at 729. Rather, the court may receive evidence via "any rational mode of inquiry," and the parties may "request an evidentiary hearing." *Id.* at 730 (quoting *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir. 1986)). Ultimately, the court must rule upon "the jurisdictional issue [unless it] is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" *Id.* (quoting *Crawford*, 796 F.2d at 928).

*Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019); *Am. Fam. Mut. Ins. Co. v. Vein Centers for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019) ("[A] motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) raises a factual challenge to the court's jurisdiction, and courts may look to evidence outside the pleadings and make factual findings." (citing *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018)).

The *Buckler* decision suggests that a challenge to subject matter jurisdiction pursuant to Rule 12(b)(1) is always "factual," but "facial" challenges are also possible:

In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). In a factual attack, the "non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* If the jurisdictional issue is "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). This court is bound by the district court's characterization of the Rule 12(b)(1) motion. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("The method in which the district court resolves a Rule 12(b)(1) motion—that is, whether the district court treats the motion as a facial attack or a factual attack—obliges us to follow the same approach.").

*Croyle by & through Croyle v. United States*, 908 F.3d 377, 380–81 (8th Cir. 2018); *accord Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024) ("The district court

viewed the Rule 12(b)(1) motion as a facial attack on jurisdiction based on the pleadings, giving Plaintiffs the same procedural safeguards as a Rule 12(b)(6) motion. 'The method in which the district court resolves a Rule 12(b)(1) motion . . . obliges us to follow the same approach.'" (citation to district court decision omitted) (quoting *Carlsen v. GameStop, Inc*., 833 F.3d 903, 908 (8th Cir. 2016)). Here, UP expressly states that its challenge is "facial." Filing 31 at 6. Thus, Rule 12(b)(6) "safeguards" apply. *Id.* Perhaps more significantly in this case, the "facial" challenge means that the Court will look only to the face of the pleadings, *id*., and to "the materials that are necessarily embraced by the pleadings and exhibits attached to the complaint," *Carlsen*, 833 F.3d at 908.

### B. The Finality of the April Order Under the APA Does Not Determine this Court's Subject Matter Jurisdiction

As explained in § II, both UP and RRB initially took the position that the April Order was "final." *See* Filing 31 at 6 (RRB "concedes Board Order 2023-33 [the April Order] is a final order within the meaning of the RUIA's judicial review provision"); Filing 32 at 2 (UP argues that it seeks review of an admittedly final order of the Board, but a procedural one rather than a decision on the merits). However, RRB asserts in its Reply that the April Order is not a final order. Filing 35 at 2 (stating as a section heading, "BOARD ORDER 2023-33 IS NOT A FINAL ORDER"). This change of position is essential to RRB's new argument that judicial review under the APA is only available once the agency renders a final decision, but because the April Order is not final, judicial review under the APA is not available. Filing 35 at 2.

This Court need not become embroiled in a dispute over whether the April Order is a "final" order for purposes of judicial review under the APA. The question before this Court is whether the April Order falls within the special statutory scheme for judicial review under the RRA and the RUIA—that is, whether the special statutory scheme deprives this Court of subject-

matter jurisdiction to review the April Order and gives subject-matter jurisdiction only to a court of appeals to do so. To put it another way, if the Court concludes that Congress intended review by a court of appeals of UP's claim that BMWED was improperly made a party to RRB's Part 258 proceeding, that conclusion would be fully dispositive of RRB's Motion to Dismiss, and it would be unnecessary for the Court to reach any of the parties' other arguments.

Consequently, the Court focuses on the special statutory scheme for judicial review under the RRA and the RUIA rather than on the requirements for judicial review under the APA.

### C. The Judicial Review Scheme for RRB Decisions

The RRA provides for judicial review as follows:

> Decisions of the Board determining the rights or liabilities of any person under this subchapter shall be subject to judicial review in the same manner, subject to the same limitations, and all provisions of law shall apply in the same manner as though the decision were a determination of corresponding rights or liabilities under the Railroad Unemployment Insurance Act except that the time within which proceedings for the review of a decision with respect to an annuity, supplemental annuity, or lump-sum benefit may be commenced shall be one year after the decision will have been entered upon the records of the Board and communicated to the claimant.

45 U.S.C. § 231g. "In other words, § 231g makes judicial review available under the RRA to the same extent that review is available under the RUIA." *Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188, 193–94 (2021).

The part of the RUIA providing for judicial review states in pertinent part as follows:

> (f) Review of final decision of Board by Courts of Appeals; costs

> Any claimant, or any railway labor organization organized in accordance with the provisions of the Railway Labor Act, of which claimant is a member, or any base-year employer of the claimant, or any other party aggrieved by a final decision under subsection (c) of this section, may, only after all administrative remedies within the Board will have been availed of and exhausted, obtain a review of any final decision of the Board by filing a petition for review within ninety days after the mailing of notice of such decision to the claimant or other party, or within such further time as the Board may allow, in the United States court of appeals for the circuit in which the claimant or other party resides or will have had his

principal place of business or principal executive office, or in the United States Court of Appeals for the Seventh Circuit or in the United States Court of Appeals for the District of Columbia.

45 U.S.C. § 355(f). In short, § 355(f) vests jurisdiction over challenges to at least certain actions of RRB in specified courts of appeals not in the district court.

Sections 231g and 355(f), which preclude district courts from exercising jurisdiction over challenges to agency action by RRB, a federal agency, create "[a] special statutory review scheme." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023) (citing, for example, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)). The Supreme Court explained,

> District courts may ordinarily hear those challenges by way of 28 U.S.C. § 1331's grant of jurisdiction for claims "arising under" federal law. Congress, though, may substitute for that district court authority an alternative scheme of review. Congress of course may do so explicitly, providing in so many words that district court jurisdiction will yield. But Congress also may do so implicitly, by specifying a different method to resolve claims about agency action. The method Congress typically chooses is the one used in both the Exchange Act and the FTC Act: review in a court of appeals following the agency's own review process. We have several times held that the creation of such a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases. *See Thunder Basin*, 510 U.S. at 207–212, 114 S.Ct. 771; *Elgin v. Department of Treasury*, 567 U.S. 1, 10–15, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012); *see also Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 489, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (noting that statutory schemes for agency review "[g]enerally" are "exclusive"). The agency effectively fills in for the district court, with the court of appeals providing judicial review.

*Axon Enterprise*, 598 U.S. at 185. The Supreme Court also explained that "a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action," as the Supreme Court had made clear in *Thunder Basin*. *Axon Enterprise*, 598 U.S. at 185.

As the Supreme Court also explained in *Axon Enterprise*,

> [In *Thunder Basin*,] [a]fter finding that Congress's creation of a "comprehensive review process" like the ones here ousted district courts of jurisdiction, the Court asked another question: whether the particular claims brought were "of the type

Congress intended to be reviewed within this statutory structure." 510 U.S. at 208, 212, 114 S.Ct. 771.

*Axon Enterprise*, 598 U.S. at 185–86. To put it another way, the question is "whether the statutory review scheme, though exclusive where it applies, reaches the claims in question." *Id.* at 186.

UP argues that "*Thunder Basin* is not on point here" because it addressed whether a dispute committed to agency adjudication in the first instance by statute could be challenged preemptively by the regulated party in federal district court. Filing 32 at 13. UP argues further that "*Thunder Basin* says nothing about the initial federal venue choice (as between the district and circuit courts) when the agency action at issue is unquestionably fit for judicial review." Filing 32 at 13–14. The Court does not agree. UP is correct that one question before the Supreme Court in *Thunder Basin* was "whether the statutory-review scheme in the Federal Mine Safety and Health Amendments Act of 1977 . . . prevents a district court from exercising subject-matter jurisdiction over a pre-enforcement challenge to the Act," and held that it does. 510 U.S. at 202. However, in *Axon Enterprise*, the Supreme Court explained that *Thunder Basin* held that creation of a review scheme providing for "review in a court of appeals following the agency's own review process . . . divests district courts of their ordinary jurisdiction over the covered cases." *See* 598 U.S. at 185 (citing *Thunder Basin*, 510 U.S. at 207–212).

Thus, the question properly before this Court in light of *Axon Enterprise* and *Thunder Basin* is whether the "special" statutory review scheme for RRB decisions "extend[s] to every claim concerning [RRB] action." *Id.* More specifically, the question is whether the statutory review scheme extends to the April Order. *Id.*

### D.  The Applicability of the Statutory Review Scheme

#### 1.  The Pertinent Factors

In *Axon Enterprise*, the Supreme Court explained how to answer the dispositive question of whether the statutory scheme extends to a particular order, as follows:

> The Court [in *Thunder Basin*] identified three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors. First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? *Id.*, at 212–213, 114 S.Ct. 771. Next, is the claim "wholly collateral to [the] statute's review provisions"? *Id.*, at 212, 114 S.Ct. 771 (internal quotation marks omitted). And last, is the claim "outside the agency's expertise"? *Ibid.* . . . The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review. *See, e.g., Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). The second and third reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to.

*Axon Enterprise,* 598 U.S. at 186. The Supreme Court explained that when the answer to each of these questions is yes, the courts presume that Congress did not intend to limit judicial review jurisdiction over the claim in question to the courts of appeals. *Id.*[2] In *Axon Enterprise*, the Supreme Court concluded that all three *Thunder Basin* factors pointed to the district court having jurisdiction to adjudicate the plaintiffs' "sweeping constitutional claims." *Id.* at 189. The Supreme Court's application of the *Thunder Basin* factors in *Axon Enterprise* is instructive in this case, although that instruction leads to the opposite conclusion.

---

[2] The Supreme Court observed that the same conclusion might also be reached even if the answers to the three questions might be different. *Axon Enterprise,* 598 U.S. at 186. It did not address such a situation because it found the answer to all three questions in that case was yes.

18

2.  *Application of the Factors*

a.  The "Foreclosure of Meaningful Judicial Review" Factor Points to Review by the Court of Appeals

In *Axon Enterprise*, the Supreme Court explained that application of the first factor—whether preclusion of district court jurisdiction "could foreclose all meaningful judicial review"—was the least straightforward in the case before it. *Id.* at 190. The Supreme Court reiterated "that adequate judicial review does not usually demand a district court's involvement" and that "[r]eview of agency action in a court of appeals can alone 'meaningfully address[ ]' a party's claims." *Id.* (citing *Thunder Basin*, 510 U.S. at 215, and *Elgin*, 567 U.S. at 21). On the other hand, the Supreme Court explained that it had previously concluded that this factor supported district court review when "absent district court jurisdiction" the plaintiff "might never have had judicial recourse." *Id.* (citing *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 490 (2010)). Because the plaintiffs then before the Supreme Court "c[ould] (eventually) obtain review of their [specific] claims through an appeal from an adverse agency action to a court of appeals," the Supreme Court concluded that this factor was not controlling. *Id.* at 190–91.

Even so, in *Axon Enterprise*, the Supreme Court concluded that a different problem was pertinent to the application of this factor, that is, a problem that stemmed "from the interaction between the alleged injury and the timing of review." *Id.* at 191. In *Axon Enterprise*, the harm to the plaintiffs was "being subjected" to "unconstitutional agency authority." *Id.* The Supreme Court found such an unconstitutional exercise of agency authority was "impossible to remedy once the proceeding is over, which is when appellate review kicks in" under the applicable judicial review statutes for actions of the Federal Trade Commission (FTC) and the Securities and Exchange Commission (SEC). *Id.* The Supreme Court concluded that where theplaintiffs'

claim was that they were "being subjected to an illegitimate proceeding," a court of appeals could do nothing, because once the proceeding happened, it could not be undone, so that judicial review would come too late to be meaningful. *Id.*

UP would seem to assert the same sort of "here-and-now" injury as the plaintiffs in *Axon Enterprise* of being subjected to an illegitimate proceeding based on BMWED's improper presence as a "party." *See id.* However, a critical difference is that the plaintiffs in *Axon Enterprise* had "sidestepped" the review scheme by bringing suit in federal district court before exhausting administrative proceedings, which would have been followed by judicial review in a court of appeals only after the agencies completed their actions. *Id.* at 191. Here, UP has not "sidestepped" the review scheme. UP alleges that it exhausted its efforts to obtain relief from the April Order from the Board before filing its original Complaint. Filing 22 at 12 (¶ 55). RRB does not argue to the contrary. Thus, the only question is whether this Court or a court of appeals now has jurisdiction over judicial review of the April Order. Judicial review of the April Order by a court of appeals in this action would not come too late to be meaningful, so UP will not suffer "foreclosure of meaningful judicial review" if a court of appeals exercises special review jurisdiction under § 231g and 355(f).

Thus, the first *Thunder Basin* factor points toward the April Order falling within the exclusive review of a court of appeals.

### b. The "Collateralism" Factor Points to Review by the Court of Appeals

The next *Thunder Basin* factor is whether the claim is "wholly collateral to [the] statute's review provisions." *Axon Enterprise*, 598 U.S. at 186. In *Axon Enterprise*, the Supreme Court called this the "collateralism" factor. *Id.* at 192. In *Axon Enterprise*, the Supreme Court concluded that this factor pointed to the constitutional claim at issue falling outside of the special statutory review scheme because the plaintiffs "object[ed] to the Commissions' power generally,

not to anything particular about how that power was wielded." *Id.* at 193. Furthermore, the claim at issue in *Axon Enterprise* did not relate to the subject of the enforcement action, which as to one plaintiff involved SEC investigation of auditing practices and as to the other plaintiff involved FTC investigation of a business merger. *Id.* The parties' claims also did not "address the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* In short, the parties' claims were "collateral" to the enforcement-related matters that the Commissions regularly adjudicated and nothing to do with those that the Commissions would adjudicate in assessing the charges against the parties. *Id.*

Again, the circumstances here differ from those in *Axon Enterprise*, so this factor does not point the same way that it did in *Axon Enterprise*. UP does not "object to the [RRB's] power generally," but it does object to a particular way in which that power is being "wielded," specifically, to make BMWED a party to the Part 258 proceeding. *See id.* UP's claim also relates to the subject of the enforcement action because it concerns BMWED's participation in an inquiry that RRB is clearly authorized to make into the potential "coverage" of the RailPros workers under the RRA and the RUIA. *See id.* Also, UP's claim about the April Order "address[es] the sorts of procedural or evidentiary matters an agency often resolves on its way to a merits decision," as it is based on RRB's determination that BMWED has information and expertise relevant to the work performed by "flaggers." *See id.*; *see also* Filing 4-4 at 3–4 (August 3, 2023, letter from the Examiner explaining, "The Board's inclusion of BMWED as a party to this Part 258 proceeding, . . . is intended to obtain additional information about those flagging services. . . ."). Thus, UP's claim that BMWED was not properly made a party to the Part 258 proceeding is not truly "collateral" to the statute's review provisions. *See Axon Enterprise*, 598 U.S. at 186.

In short, the "collateralism" factor from *Thunder Basin* points toward the April Order falling within the exclusive review of a court of appeals.

    c.  The "Agency's Expertise" Factor Points to Review by the Court of Appeals

The last *Thunder Basin* factor is whether the claim is "outside the agency's expertise." *Axon Enterprise*, 598 U.S. at 186. In *Axon Enterprise*, the Supreme Court considered whether the claim presented was "detached from 'considerations of agency policy.'" *Id.* at 194 (quoting *Free Enterprise Fund*, 561 U.S. at 491). In that case, the Supreme Court observed, "The [FTC] knows a good deal about competition policy, but nothing special about the separation of powers," where separation of powers was the basis for the plaintiffs' constitutional challenge. *Id.* The Supreme Court also observed, "[T]he Government here does not pretend that Axon's and Cochran's constitutional claims are . . . intertwined with or embedded in matters on which the Commissions are expert." *Id.* at 195.

Again, the circumstances are different here. The challenged decision is about whether BMWED has information and expertise that would be useful to RRB's determination of coverage issues under the RRA and the RUIA such that BMWED should be a party to a Part 258 proceeding. *See* Filing 4-4 at 3–4. That decision is not "detached from 'considerations of agency policy.'" *Axon Enterprise*, 598 U.S. at 194. Indeed, RRB knows "a great deal about" the policy of railroad worker benefits coverage, and UP's claim does not involve policies more properly within the knowledge of the courts. *Id.* Here, it is UP, not RRB, that struggles to explain why its claim that BMWED's participation as a party is not intertwined with or embedded in the matters on which RRB is expert. *Id.* at 195.

Consequently, like the other two *Thunder Basin* factors, this last one points toward the April Order falling within the exclusive review of a court of appeals.

       d.  This Court Concludes that Congress Intended Review by a Court of Appeals of UP's Claim

In *Axon Enterprise*, the Supreme Court explained that when the answer to each of the *Thunder Basin* questions is yes, the courts presume that Congress did not intend to limit judicial review jurisdiction over the claim in question to the specified courts of appeals. 598 U.S. at 186. This case presents the opposite situation in which each of the three answers is no. Thus, the Court concludes that Congress intended review by a court of appeals of UP's claim that BMWED was improperly made a party to RRB's Part 258 proceeding. Accordingly, because UP has failed to carry its "burden of proving the existence of subject matter jurisdiction," *Buckler*, 919 F.3d at 1044 (quoting *Herden*, 726 F.3d at 1046), RRB is entitled to dismissal. Because that conclusion is fully dispositive of RRB's Motion to Dismiss, the Court finds it unnecessary to reach any of the parties' other arguments.

## IV. CONCLUSION

Upon the foregoing,

IT IS ORDERED that RRB's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), Filing 30, is granted, and this case is dismissed for lack of subject-matter jurisdiction in this Court.

Dated this 12th day of July, 2024.

                    BY THE COURT:

                    _____

                    Brian C. Buescher
                    United States District Judge